1  T. RANDOLPH CATANESE, ESQ., CA Bar No. 110308
2  randy@cataneselaw.com
   BRADLEY W. GOULD, ESQ., CA Bar No. 327989
3  brad@cataneselaw.com
4  **CATANESE & WELLS, A LAW CORPORATION**
   4580 E. Thousand Oaks Blvd., Suite 250
5  Westlake Village, California, 91362
6  Telephone: 818-707-0407 / Facsimile: 818-707-1161
7  Attorneys for Plaintiff

8                    UNITED STATES DISTRICT COURT

9                  NORTHERN DISTRICT OF CALIFORNIA
10

11 KIM ZVIK, an individual,              Case No.:
12
                   Plaintiff,            **COMPLAINT FOR DAMAGES AND
13                                        INJUNCTIVE RELIEF:**
14      vs.
                                         **(1) COPYRIGHT INFRINGEMENT (17
15                                        U.S.C. §501)
16 MARCY ROTH, an individual,            (2) DEFAMATION – LIBEL AND LIBEL
                                          PER SE;
17                 Defendant.            (3) DEFAMATION – SLANDER AND
18                                        SLANDER PER SE;
                                         (4) INTENTIONAL INTERFERENCE
19                                        WITH CONTRACTUAL RELATIONS;
20                                        (5) INTENTIONAL INTERFERENCE
                                          WITH PROSPECTIVE ECONOMIC
21                                        RELATIONS; AND,
22                                        (6) NEGLIGENT INTERFERENCE
                                          WITH PROSPECTIVE ECONOMIC
23                                        RELATIONS.**
24
25                                       **[DEMAND FOR JURY TRIAL]**
26
27                         **<u>COMPLAINT</u>**
28
   Plaintiff KIM ZVIK hereby alleges for her Complaint against Defendant MARCY

                                  1

ROTH, on personal knowledge as to Plaintiff's own activities, and on information and belief as to the activities of others, as follows.

## THE PARTIES

1.    Plaintiff KIM ZVIK (hereinafter "KIM" or "Plaintiff") is, and at all times mentioned was, an individual citizen of the state of California.

2.    Defendant MARCY ROTH (hereinafter "MARCY" or "Defendant") is, and at all times mentioned was, an individual citizen of the state of Colorado.

## JURISDICTION AND VENUE

3.    This Court has subject matter jurisdiction over Plaintiff's claims for copyright infringement and related claims pursuant to 28 U.S.C. §1331, 17 U.S.C. §101, *et seq.*, and 28 U.S.C. 1338(a).  The pendent state law claims are so related to the federal claims that they form part of the same case or controversy pursuant to Article III of the United States Constitution.  This Court therefore has supplemental jurisdiction over those claims pursuant to 28 U.S.C. section 1367(a).

4.    Venue is proper in this district pursuant to 28 U.S.C. §§1391(a) and 1391(b) because a substantial part of the events or omissions giving rise to the claims arose in this district.  Because the Defendant has sufficient minimum contacts with the chosen forum, this Court has personal jurisdiction over the Defendant.

## NATURE OF DISPUTE

5.    On or about July 12, 2024, KIM and MARCY entered into a "Purchase Agreement" whereby KIM purchased the horse known as *Fortune CH aka "Cookie"* (hereinafter the "Horse") from MARCY for the purchase price of $14,000.00.  KIM paid the full purchase price to MARCY in exchange for a transfer of full ownership of the Horse from MARCY to KIM.  The Purchase Agreement confirmed that from the moment the Horse left MARCY'S stable, KIM assumed full liability for the Horse as the new owner.  A true and correct copy of the July 12, 2024, Purchase Agreement is attached hereto as Exhibit "A."

6.    Following the Purchase Agreement, KIM became the sole and exclusive owner of the Horse free of any claims or rights by MARCY.  Specifically, the Purchase Agreement did not give MARCY any post-sale rights to the Horse, including no right of inspection of the Horse and no right to information regarding the Horse.  KIM has never given MARCY the right to inspect or examine the Horse once the purchase price was paid by KIM to MARCY.

7.    Notwithstanding the above, following the sale of the Horse from MARCY to KIM, MARCY began to interfere with KIM's ownership and control of the Horse by demanding, over a series of months, that KIM allow her to continue to monitor, inspect and examine the Horse.  These requests were refused by KIM.

8.    Following the refusal by KIM to allow MARCY to continue to monitor and examine the Horse, MARCY engaged in an intentional course of escalating acts of harassment and oral and written defamation against KIM damaging KIM's reputation and causing disruption with KIM's contractual and economic interests with third parties, as described below.

9.    Beginning shortly after the sale of the Horse in July of 2024, MARCY began contacting KIM via Facebook Messenger and text messaging regarding the Horse. Throughout the rest of 2024, MARCY contacted KIM multiple times per week to check in on the Horse and provide unsolicited advice and commentary regarding the Horse's condition, weight, diet, and training.  On January 6, 2025, MARCY offered to repurchase the Horse from KIM, which offer was refused by KIM.

10.    In February of 2025, MARCY's behavior escalated.  On February 7, 2025, MARCY flew out uninvited from Colorado to Contra Costa County in an attempt to repurchase the Horse from KIM.  On February 8, 2025, MARCY went to the location of where the Horse was being stabled (Orinda, California) and trespassed and harassed associates of KIM regarding the Horse.  On February 9, 2025, MARCY went to KIM's home and harassed her at her house until KIM was forced to call the police, which led to the filing of a request for a temporary restraining order by KIM against MARCY on February 14, 2025 (which request was ultimately denied by the Contra Costa County Superior Court on March 4, 2025).

11.    On February 10, 2025, MARCY contacted the Contra Costa County Animal Services Department to make animal abuse and neglect allegations against KIM.  A true and correct copy of the report taken by the Animal Services Department is attached hereto as Exhibit "B."  The report details the telephone conversation between Animal Services and MARCY, wherein MARCY alleged, among other things, that KIM was not feeding the Horse and that the Horse was very thin and was risking organ failure.  She alleged that KIM was "an evil woman" and in later conversations alleged that KIM was very litigious, had "starved horses in the past" and refused to give her horses proper treatment.  Due to the false allegations of MARCY, KIM was advised by Animal Services of California Penal Code Section 597, which states that "every person who maliciously and intentionally maims, mutilates, tortures, or wounds a living animal, or maliciously and intentionally kills an animal, is guilty of a crime."  Following the communications from Animal Services, KIM had the Horse examined by Cory H. Soltau, D.V.M. on February 25, 2025.  In Dr. Soltau's report he confirmed that the Horse had an acceptable condition for winter pasture and found the Horse to have a body score of 3.5/9 (between moderately thin and thin).  Dr. Soltau's report indicated that he believed the Horse would gain weight naturally as the spring approached as new grass appeared in the pasture.

12.    Beginning on February 20, 2025, MARCY began a defamation campaign against KIM on Facebook including over twenty (20) posts, photographs, videos, and profiles.  The posts alleged that KIM was allowing the Horse to "starve" and was engaged

in animal abuse and neglect.  The posts also included "doxxing" by MARCY against KIM. (Doxxing is the act of publicly revealing someone's private information, such as their name, address, or phone number, without their consent, often to shame or intimidate them.  It typically occurs online and can lead to harassment or other harmful consequences for the victim.)  True and correct copies of some of the Facebook posts are collectively attached hereto as Exhibit "C."

13.    Included in the Facebook posts and photographs posted by Defendant was a photograph of the Horse owned and copyrighted by Plaintiff: *Cookie2024*, U.S. Copyright Registration Number VA 2-441-905.  A true and correct copy of the Certificate of Registration for the photograph and the copyrighted photograph are collectively attached hereto as Exhibit "D."

14.    The Horse is pastured by KIM at the Orinda Horse Association (the "OHA") in Orinda, California.  The OHA leases 443 acres of rangeland pasture in north Orinda from East Bay Municipal Utility District (the "EBMUD").  KIM has had a relationship with the OHA for 32 years and has been a proprietary member of the OHA for 26 years. In February of 2025, in conjunction with the wrongful activities noted above, MARCY began to contact the OHA and make the same defamatory allegations regarding KIM's ownership of the Horse.  On March 5, 2025, and March 10, 2025, the OHA Board of Directors sent e-mail correspondence to MARCY addressing her claims and in both e-mails the OHA Board demanded that MARCY cease and desist her attacks on the OHA and

posting of misleading information on social media.  True and correct copies of the March 5, 2025, and March 10, 2025 e-mails from the OHA to MARCY are collectively attached hereto as Exhibit "E."  On information and belief, MARCY has also engaged in activities designed to disrupt or resulting in the disruption of the relationship between OHA and its landlord EBMUD.  MARCY's defamatory conduct regarding the OHA have jeopardized KIM's relationship with the organization and continuing ability to pasture the HORSE at OHA.

15.    On information and belief, MARCY's defamatory conduct as alleged herein has aso jeopardized KIM's membership and participation with American Endurance Ride Conference (the "AERC").  KIM belongs to the AERC and has ridden the Horse in AERC events in the past.

16.    On information and belief, MARCY's defamatory conduct also includes false and defamatory statements on LinkedIn, jeopardizing KIM's professional career.

17.    On information and belief, MARCY's defamatory conduct was designed to damage or has resulted in damage to the resale value of the Horse and other horses owned by Plaintiff, including *Comet*.

18.    On March 20, 2025, counsel for Plaintiff sent a cease and desist letter via U.S. Mail and e-mail to MARCY demanding that she immediately cease and desist from any further defamation of KIM.  A true and correct copy of counsel's March 20, 2025, letter is attached hereto as Exhibit "F."  No response was received from MARCY to the letter, and

in fact MARCY's defamatory activities did not cease and desist following that date.

## COUNT I

## COPYRIGHT INFRINGEMENT – 17 U.S.C. §501

19.    Plaintiff realleges and incorporates by reference herein, paragraphs 1 through 18, inclusive, of the preliminary allegations, as though said paragraphs were set forth herein at length.

20.    At all times relevant hereto, Plaintiff was the producer and owner of the photographic work reproduced, distributed and publicly displayed by Defendant through various online social media sites, including, but not limited to, facebook.com.

21.    For the work at issue in this matter, Plaintiff holds a copyright registration certificate from the United States Copyright Office.

22.    Without authorization, Defendant reproduced and distributed the following Plaintiff owned and copyrighted work: *Cookie2024*, U.S. Copyright Registration Number VA 2-441-905.

23.    Plaintiff did not authorize Defendant's copying, display or distribution of her copyrighted works.

24.    Defendant infringed the copyright in Plaintiff's copyrighted work by reproducing, distributing and/or publicly displaying the work through various online social media sites, including, but not limited to, facebook.com without proper approval or authorization of Plaintiff.

25. Defendant knew the infringed work belonged to Plaintiff and that Defendant did not have permission to exploit Plaintiff's copyrighted work.

26. Defendant knew her act constituted copyright infringement.

27. Defendant's conduct was willful within the meaning of the Copyright Act.

28. As a result of the wrongful conduct, Defendant is liable to Plaintiff for copyright infringement pursuant to 17 U.S.C. §501. Plaintiff has suffered, and will continue to suffer substantial losses, including but not limited to damage to her reputation and goodwill within the equine community.

29. Plaintiff is entitled to recover damages, which include her losses and any and all profits Defendant has made as a result of her wrongful conduct. 17 U.S.C. §504. Alternatively, Plaintiff is entitled to statutory damages under 17 U.S.C. §504(c).

30. In addition, because Defendant's infringement was willful, the award of statutory damages should be enhanced in accordance with 17 U.S.C. §504(c)(2).

31. Plaintiff is entitled to recover her attorneys' fees and costs of suit pursuant to 17 U.S.C. §505.

///

///

///

## COUNT II

## DEFAMATION – LIBEL AND LIBEL PER SE

32.     Plaintiff realleges and incorporates by reference herein, paragraphs 1 through 18, inclusive, of the preliminary allegations, as though said paragraphs were set forth herein at length.

33.     MARCY made the written statements alleged herein to persons other than KIM.

34.     The people reading the statements reasonably understood that the statements were about KIM.

35.     These people reasonably understood the statements to mean that KIM was engaging in animal abuse, neglect and cruelty, a crime under California law.

36.     The statements made by MARCY are untrue and constitute false statements of fact that are defamatory.  MARCY failed to use reasonable care to determine the truth or falsity of the statements.

37.     MARCY's wrongful conduct was a substantial factor in causing harm to KIM's property, business, trade, profession or occupation.  MARCY's wrongful conduct was also a substantial factor in causing harm to KIM's reputation.  Accordingly, KIM is entitled to recover her actual damages suffered as a result of MARCY's wrongful conduct.

38.     In addition to actual damages, even if KIM does not prove any actual damages for harm to reputation or shame, mortification, or hurt feelings, damages are presumed and

the law assumes that she has suffered this harm.

## COUNT III

## DEFAMATION – SLANDER AND SLANDER PER SE

39.    Plaintiff realleges and incorporates by reference herein, paragraphs 1 through 18, inclusive, of the preliminary allegations, as though said paragraphs were set forth herein at length.

40.    MARCY made the oral statements alleged herein to persons other than KIM.

41.    The people hearing the statements reasonably understood that the statements were about KIM.

42.    These people reasonably understood the statements to mean that KIM was engaging in animal abuse, neglect and cruelty, a crime under California law.

43.    The statements made by MARCY are untrue and constitute false statements of fact that are defamatory.  MARCY failed to use reasonable care to determine the truth or falsity of the statements.

44.    MARCY's wrongful conduct was a substantial factor in causing harm to KIM's property, business, trade, profession or occupation.  MARCY's wrongful conduct was also a substantial factor in causing harm to KIM's reputation.  Accordingly, KIM is entitled to recover her actual damages suffered as a result of MARCY's wrongful conduct.

45.    In addition to actual damages, even if KIM does not prove any actual damages for harm to reputation or shame, mortification, or hurt feelings, damages are presumed and

the law assumes that she has suffered this harm.

## COUNT IV

## INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS

46.    Plaintiff realleges and incorporates by reference herein, paragraphs 1 through 18, inclusive, of the preliminary allegations, as though said paragraphs were set forth herein at length.

47.    Plaintiff has invested resources and efforts to develop and maintain her contractual relationships with the OHA, EBMUD and AERC (collectively "Relationships"). These Relationships contained the probability of future economic benefit to Plaintiff and Plaintiff relied on these relationships to pasture the Horse and compete with the Horse.  Defendant had knowledge of the Relationships.  Defendant is not and has never been a party to these contracts.

48.    Defendant's unlawful conduct as alleged herein constitutes intentionally wrongful acts designed to disrupt the Relationships.  As a direct result of such acts, the Relationships were actually disrupted and Plaintiff suffered economic harm proximately caused by the wrongful acts, including Plaintiff's retention of legal counsel (incurred legal fees and costs) in defense of Plaintiff's reputation and the Relationships and other damages in an amount to be proven at trial.

49.    In committing her unlawful conduct, Defendant acted with malice, oppression and fraud with the intention of injuring Plaintiff.  Defendant's actions were made in an

effort to interfere with Plaintiff's contractual and professional relationships. Accordingly, Plaintiff is entitled to an award of punitive damages against Defendant in an amount to be proven at trial.

## COUNT V

## INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS

50.     Plaintiff realleges and incorporates by reference herein, paragraphs 1 through 18, inclusive, of the preliminary allegations, as though said paragraphs were set forth herein at length.

51.     Plaintiff successfully fostered and developed economic relationships with the OHA, EBMUD, and AERC.  These relationships provided Plaintiff a  probability of future economic benefit.

52.     With full knowledge of these relationships, Defendant intentionally engaged in unlawful and unethical conduct in mounting a campaign to deliberately disrupt the relationships.  The defamatory actions taken by Defendant were independently wrongful beyond the interference to Plaintiff's economic relationships.

53.     When engaging in the intentional acts above, Defendant knew of Plaintiff's economic relationships with OHA, EBMUD, and AERC.  These acts were designed to disrupt and terminate Plaintiff's economic relationships.  As a result of these acts, Plaintiff's economic relationships were actually disrupted and continue to be disrupted.

54.     As a direct and proximate result of the aforementioned acts of the Defendant, Plaintiff has suffered and will continue to suffer severe economic harm and other damages in an amount to be proven at time of trial.

55.     In committing her unlawful conduct, Defendant acted with malice, oppression and fraud with the intention of injuring Plaintiff. Defendant's actions were made in an effort to interfere with Plaintiff's prospective economic relationships. Accordingly, Plaintiff is entitled to an award of punitive damages against Defendant in an amount to be proven at trial.

## <u>COUNT VI</u>

## <u>NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC</u>

## <u>RELATIONS</u>

56.     Plaintiff realleges and incorporates by reference herein, paragraphs 1 through 18, inclusive, of the preliminary allegations, as though said paragraphs were set forth herein at length.

57.     Plaintiff successfully fostered and developed economic relationships with OHA, EBMUD, and AERC. These relationships provided Plaintiff a probability of future economic benefit.

58.     Defendant knew of Plaintiff's relationships with OHA, EBMUD, and AERC.

59.     Defendant knew or should have known that Plaintiff's relationships with OHA, EBMUD and AERC would be disrupted if she failed to act with reasonable care.

60.    In undertaking the actions alleged herein, Defendant failed to act with reasonable care.

61.    The defamatory actions taken by Defendant were independently wrongful beyond the interference to Plaintiff's economic relationships.

62.    As a result of Defendant's actions, the relationships between Plaintiff and OHA, EBMUD, and AERC were disrupted.

63.    As a direct and proximate result of the aforementioned acts of the Defendant, Plaintiff has suffered and will continue to suffer severe economic harm and other damages in an amount to be proven at time of trial.

///

///

///

## APPLICATION FOR TEMPORARY AND PERMANENT INJUNCTIVE RELIEF

64.    Plaintiff realleges and incorporates all preceding paragraphs herein by reference.

65.    Because Plaintiff's remedy at law is inadequate, Defendant seeks, in addition to her damages, a temporary, preliminary, and permanent injunction, ordering Defendant to cease, desist, and refrain from the wrongful activities stated herein.

66.    Plaintiff is likely to succeed on the merits of this case because, among other reasons, Defendant has engaged in the wrongful conduct as alleged herein.

67.    If Defendant is not restrained from performing the illegal actions described herein, Defendant's actions will result in immediate and irreparable harm to Plaintiff's business and her reputation in the equine community.  Plaintiff has been and will continue to be injured by the Defendant's conduct.

68.    The issuance of a temporary and permanent injunction preventing Defendant from continuing to perform the illegal activity described herein is necessary to prevent immediate, substantial, and irreparable injury to Plaintiff.  As such, a balance of equities tips in Plaintiff's favor and an injunction is in the public interest.

69.    Defendant should be temporarily enjoined during the pendency of this action and then permanently enjoined from continuing the wrongful conduct described herein.

70.    Plaintiff is willing to post bond as required by law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendant as follows:

As to the First Count for Copyright Infringement

71.    That the Court enter a judgment against Defendant that she has willfully infringed Plaintiff's rights in a federally registered copyright under 17 U.S.C. §501, and otherwise injured the business reputation and business of Plaintiff by her acts and conduct as set forth in this Complaint;

72.    That the Court issue injunctive relief against Defendant and that Defendant, her agents, representatives, servants, employees, attorneys, successors and assigns, and all others in active concert or participation with her be enjoined from copying, posting or making any other other infringing use or infringing distribution of photographs or other materials owned by or registered to Plaintiff;

73.    That the Court enter an order of impoundment pursuant to 17 U.S.C. §503 and 509(a) impounding all infringing copies of Plaintiff's photographs or other materials, which are in Defendant's possession or under her control;

74.    That the Court order Defendant to pay Plaintiff's general, special, actual and statutory damages as follows:

    a.    Plaintiff's damages and Defendant's profits pursuant to 17 U.S.C. §504(b), or in the alternative, enhanced statutory damages pursuant to 17 U.S.C. §504(c)(2), for Defendant's willful infringement of

Plaintiff's copyrights;

    b.    Plaintiff's damages and Defendant's profits pursuant to Cal. Civ. Code §3344 or in the alternative statutory damages pursuant to Cal. Civ. Code §3344;

75.    That the Court order Defendant to pay punitive damages pursuant to Cal. Civ. Code §3344;

76.    That the Court order Defendant to pay Plaintiff both the costs of this action and the reasonable attorneys' fees incurred by her in prosecuting this action pursuant to 17 U.S.C. §504 and Cal. Civ. Code §3344(a);

77.    For such other and further relief as the Court deems proper.

As to the Second Count for Defamation – Libel and Libel Per Se

78.    For compensatory damages in a sum according to proof at the time of trial;

79.    For exemplary and punitive damages in a sum according to proof at the time of trial;

80.    For such other and further relief as the Court deems proper.

As to the Third Count for Defamation – Slander and Slander Per Se

81.    For compensatory damages in a sum according to proof at the time of trial;

82.    For exemplary and punitive damages in a sum according to proof at the time of trial;

83.    For such other and further relief as the Court deems proper.

As to the Fourth Count for Intentional Interference with Contractual Relations

84.    For compensatory damages in a sum according to proof at the time of trial;

85.    For exemplary and punitive damages in a sum according to proof at the time of trial;

86.    For such other and further relief as the Court deems proper.

As to the Fifth Count for Intentional Interference with Prospective Economic Relations

87.    For compensatory damages in a sum according to proof at the time of trial;

88.    For exemplary and punitive damages in a sum according to proof at the time of trial;

89.    For such other and further relief as the Court deems proper.

As to the Sixth Count for Negligent Interference with Prospective Economic Relations

90.    For compensatory damages in a sum according to proof at the time of trial;

91.    For such other and further relief as the Court deems proper.

Respectfully Submitted,

Dated: May 1, 2025

CATANESE & WELLS
A Law Corporation


By:    _/s/ T. Randolph Catanese_____
       T. Randolph Catanese
       Attorney for Plaintiff
       KIM ZVIK

## **DEMAND FOR JURY TRIAL**

Plaintiff KIM ZVIK hereby demands trial by jury on all causes of action.

Respectfully Submitted,

Dated: May 1, 2025

CATANESE & WELLS
A Law Corporation

By:   */s/ T. Randolph Catanese*
T. Randolph Catanese
Attorney for Plaintiff
KIM ZVIK

EXHIBIT "A"

PURCHASE AGREEMENT

This agreement is made between Marcy Roth, hereinafter referred to as "Seller", and Kim Zvik hereinafter referred to as "Buyer". This agreement is entered into between Buyer and Seller for the purchase of the horse (the "Horse") described below on the following terms and conditions:

Description of the Horse:
    Name: Fortune CH
    Age: 9
    Height: 16hh
    Color: Dark Bay
    Breed: Arabian, IAHA #
    Sex: Gelding

Terms and Conditions:
A. SALE PRICE
The sale price ("Sale Price") shall be $14,000. Seller agrees to sell Buyer the Horse as described below, and Buyer agrees to purchase the Horse on the terms set forth in this agreement.

B. PAYMENT TERMS
The Sale Price shall be paid in the amount of $14,000 by cash on or before July 12, 2024.

        For purpose of this paragraph, notice can be given to Seller by mail to Seller at Marcy Roth, 10394 Macedonia St, Longmont, CO 80503 or text 415 549 5049.
- REGISTRATION
- Buyer shall file all necessary documents and pay all necessary fees to have Buyer registered as the owner of the Horse with the Arabian Horse Association.
- VETERINARY PRE-PURCHASE EXAM
- Buyer shall order a pre-purchase veterinary exam to be conducted at Buyer's expense. Buyer agrees to either pay for the Horse in the agreed upon manner or to terminate this agreement without further liability if the vet exam is not satisfactory in Buyer's sole opinion.
- WARRANTIES

- Seller makes no warranties expressed or implied, including warranties of fitness for any particular purpose other than having clear title to the Horse. Buyer is to determine fitness for Buyer's requirements during the veterinary pre-purchase exam.
- OWNERSHIP TRANSFER
- Upon payment of the Sale Price, Seller agrees to execute a BILL OF SALE in the form of Exhibit A to this agreement to transfer ownership to Buyer.
- LIABILITY
- Effective the moment the Horse leaves Seller's stable, Buyer assumes full liability and agrees to indemnify and hold Seller, Seller's agent and any other parties related to this sale, harmless from any damage or injury to any animal, person or property caused to or by said horse including death to person, animal or destruction of property.
- LAW
- The terms of this Agreement and disputes developing thereunder shall be enforced and construed in accordance with the laws of the State of California.
- DEFAULT
- In the event of a breach, the other party shall have the right to recover from the breaching party all damages including reasonable attorney's fees and court costs.
- JURISDICTION
- In the event of breach of contract, dispute shall be settled in Contra Costa County.

EXECUTED THIS __12__ DAY OF __July 2024__, at __Kensington__, California
Buyer:
Kim Zvik, 263 Kenyon Ave, Kensington, CA 94708 (510) 421 3140 cell
EXECUTED THIS _____ DAY OF _____, at _____, Colorado
Seller:
Marcy Roth, Marcy Roth, 10394 Macedonia St, Longmont, CO 80503 or text 415 497 5049.

EXHIBIT "B"

**Contra Costa County Animal Services Department Activity Card**

A25-001681-7          **INV/INHUMANE2**          Priority Level: 3          Total Animals:  1          Animal Type:  DOG

Activity Address:  640 EL TOYONAL AVE  ORINDA ,  CA      94563

Actvity Comment:   Lt. Weissman or Sgt. Flauding to handle

### Contra Costa County Animal Services Department Activity Card

A25-001681-7    **INV/INHUMANE2**    Priority Level: 3    Total Animals: 1    Animal Type: DOG

Activity Address: 640 EL TOYONAL AVE  ORINDA , CA    94563

Actvity Comment:  Lt. Weissman or Sgt. Flauding to handle

---

**Caller Information:**

P0595656    MARCY ROTH    Call Date:    02/10/25  08:45 AM

LOCATION OF CALL:    640    EL TOYONAL    AVE

| # | Activity Type | Result | Result | Result | Officer | Dispatched | Complete Date | Status |
|---|---|---|---|---|---|---|---|---|
| 4 | INV | INHUMANE2 | CON-D | CON-M | CAO | P9987419 | 2/14/25  14:13 | 2/14/25  14:49 | COMPLETED |
| 5 | INV | INHUMANE2 | PHN-C | CAO | | P9994810 | 2/28/25  13:00 | 2/28/25  14:12 | COMPLETED |
| 6 | INV | INHUMANE2 | PHN-D | CAO | | P9982474 | 2/28/25  10:59 | 2/28/25  11:05 | COMPLETED |
| 7 | INV | INHUMANE2 | | | | | | 2/28/25  14:53 | PENDING |

LOCATION OF CALL:    760    EL TOYONAL

| # | Activity Type | Result | Result | Result | Officer | Dispatched | Complete Date | Status |
|---|---|---|---|---|---|---|---|---|
| 1 | INV | INHUMANE2 | PHN-C | PHN-D | RPRT | CAO | P9966088 | 2/11/25  8:38 | 2/11/25  13:53 | COMPLETED |

LOCATION OF CALL:    263    KENYON    AVE

| # | Activity Type | Result | Result | Result | Officer | Dispatched | Complete Date | Status |
|---|---|---|---|---|---|---|---|---|
| 2 | INV | INHUMANE2 | PHN-M | PHN-D | CAO | P9994810 | 2/11/25  15:57 | 2/11/25  16:32 | COMPLETED |
| 3 | INV | INHUMANE2 | PHN-D | CAO | | P9994810 | 2/11/25  17:38 | 2/11/25  22:23 | COMPLETED |

---

**Owner Information:**    **Co-Owner:**

P0344152    KIM ZVIK

---

## Contra Costa County Animal Services Department Activity Card

A25-001681-7     **INV/INHUMANE2**     Priority Level: **3**     Total Animals: **1**     Animal Type: **DOG**

Activity Address: **640 EL TOYONAL AVE  ORINDA , CA     94563**

Actvity Comment: **Lt. Weissman or Sgt. Flauding to handle**

Animals Licensed or Linked to Owner:

**ZVIK, KIM**

### DOG

| Animal # | Name | Sex | Color | Breed | Born | Tag # | Tag Type | Status | Tag Exp. | Rabies Exp. |
|---|---|---|---|---|---|---|---|---|---|---|
| A0365465 | MIMI | S | WHITE | POMERANIAN | Nov-94 | L03-069832 | LIC SN 3 | DEAD | 12/2/06 | 12/2/06 |
| A0725977 | ROCKY | N | TAN | ANATOL SHEPHERD | Apr-11 | L17-229809 | LIC SN 3 | CURRENT | 3/4/20 | 3/4/20 |
| A0423127 | WILLOW | N | BROWN WHITE | SIBERIAN HUSKY | Jun-04 | L12-013938 | LIC SN 3 | DEAD | 1/27/15 | 1/27/15 |
| A0423127 | WILLOW | N | BROWN WHITE | SIBERIAN HUSKY | Jun-04 | P11-006669 | PDA YEAR | DEAD | 10/26/12 | 1/27/15 |

### CAT

| Animal # | Name | Sex | Color | Breed | Born | Tag # | Tag Type | Status | Tag Exp. | Rabies Exp. |
|---|---|---|---|---|---|---|---|---|---|---|
| A0797865 | MOO | N | WHITE BLACK | ORIENTAL SH | Nov-11 | L15-314208 | LIC CAT SN | CURRENT | 4/25/16 | 4/25/16 |
| A0797865 | MOO | N | WHITE BLACK | ORIENTAL SH | Nov-11 | 982000357769 | OTHER CH | CURRENT | 4/30/15 | |

### LIVESTOCK

| Animal # | Name | Sex | Color | Breed | Born | Tag # | Tag Type | Status | Tag Exp. | Rabies Exp. |
|---|---|---|---|---|---|---|---|---|---|---|
| A1028702 | FORTUNE CH | G | BROWN WHITE | HORSE | | U25-001269 | LINK | CURRENT | 2/11/25 | |

2/9/2025

---

Memo   **2/11/2025**        Memo #:   **M25-003713        1**

02/10/25 at 0845 hours, RP SOLD HORSE // RP FOUND OUT HORSE ISN'T BEING FED // RP TRIED TO BUY BACK HORSE AT HIGHER PRICE TO ENSURE IT WAS SAFE // BUYER REFUSED TO SELL IT BACK // RP REQUESTED 10-21 BROWN, DARK BROWN LEGS, SMALL WHITE STAR ON FOREHEAD

02/11/25 at 1046 hours, RP CALLING BACK REGARDING INCIDENT #7 FROM 2/10 // SHE WOULD LIKE TO OFFER ASSISTANCE IN LOCATING THE HORSE SINCE IT'S IN AN OPEN SPACE AND MAY BE DIFFICULT TO FIND // RP IS LEAVING TOWN TOMORROW AND WOULD LIKE TO SPEAK TO SOMEONE TODAY, SHE IS VERY CONCERNED ABOUT THE WELFARE OF THIS HORSE

At 1241 hours, I telephoned the reporting party, Marcy Roth at ▓▓▓▓▓▓ who had requested a telephone call about a horse she had sold. I advised Roth who I was. Roth provided me with her home address and told me the following: She came to California from Colorado to check on a horse named "Fortune CH" aka "Cookie" a 9-year-old, gelding, brown horse that she sold 6-months ago for $14000. She sold "Cookie" to Kim Zvik, ▓▓▓▓▓▓ who now lives at ▓▓▓▓▓ in Kensington. Zvik has "Cookie" at ▓▓▓▓▓ in Orinda which is the water district property and ran by the Orinda Horseman's Association. Prior to "Cookie" being shipped to California he was examined by a vet and found to be in perfect condition. Last month she saw a Facebook post of "Cookie" and saw that "Cookie" has lost a lot of weight. She talked with Zvik, who told her "Cookie" was seen by a vet and that he is thin and ok. She offered to buy "Cookie" back and Zvik told her $18000. Zvik does not want to sell back "Cookie" to her. Zvik will not allow her to see "Cookie" even though it was in their contract that visits were allowed. "Cookie's" riding sponsor, Bryanna Stevenson at ▓▓▓▓▓▓ feeds "Cookie" when she rides him. Stevenson told her that when her two horses arrive she will no longer ride "Cookie" and will no longer feed "Cookie". Her Colorado DVM Rosemary Strong at ▓▓▓▓▓ told her that "Cookie" is eating grass that has a lot of water in it and "Cookie" is risking organ failure. She last saw "Cookie" on Saturday February 8, 2025 and he was very thin. Zvik has a second horse named "Comet" that has a saddle sore. She is willing to pay for a vet exam of "Cookie". She is willing to meet with Animal Services to show where "Cookie" is at. She is flying back to Colorado tomorrow afternoon. Zvik has sued the Orinda Horseman's Association twice and is an evil woman. Roth sent me pictures of "Cookie" and screenshots of her text message with Zvik. I placed the pictures and screenshots on the Animal Services SharePoint.

At 1349 hours, I attempted telephone contact with the horse owner, Kim Zvik at ▓▓▓▓▓▓ twice and there was no

**Contra Costa County Animal Services Department Activity Card**

A25-001681-7     INV/INHUMANE2     Priority Level: 3     Total Animals: 1     Animal Type: DOG

Activity Address: 640 EL TOYONAL AVE  ORINDA , CA     94563

Actvity Comment: Lt, Weissman or Sgt. Flauding to handle

answer. I left a voice message to call Animal Services. I placed a copy of this activity in the watch commander's box for review. T. Dumandan

02/11/25 15:21 Kim Zvik [redacted] called in advised she does not answer blocked calls so would like to be texted before called. She advised general availbility is 7am-10:30am. She advised she will gladly cooperate with whatever is needed but will not answer unknown/blocked calls. LCifu

UPDATE TO LINE 8 // RP WANTS A 21 // RP IS FLYING BACK TO COLORADO TOMORROW AND WOULD LIKE TO MAKE SURE THE HORSE IS FOUND/HELPED // CASE #A5001681 // RP WOULD LIKE ANOTHER OFFICER TO CALLER HER SINCE SHES LEAVING TOMORROW

02/11/25 at 1558 hours Animal services Officer Dumandan briefed me on an inhumane investigation regarding a 9-year-old, gelding, brown horse named "Fortune CH" also known as "Cookie" owned by Kim Zvik. The previous owner Marcy Roth had concerns regarding "Cookie's" weight loss and improper diet risking organ failure . I understood Animal Services needed to make contact with K. Zvik to obtain the following information:

1.  Who was feeding "Cookie"
2.  When was "Cookie" being fed
3.  What was "Cookie" being fed
4.  Who was providing veterinary care for "Cookie"
5.  When "Cookie" was last seen by a veterinarian
6.  The location of the pasture "Cookie" was living at
7.  K. Zvik's availability to meet with Animal Services and observe "Cookie"

At 1620 hours I sent a text message to K. Zvik at [redacted] as she requested. My message read:

"Good afternoon, this message is for Kim Zvik. This is Officer Harrigan with Animal Services. I'm reaching out for more information on "Fortune CH" aka "Cookie" and activity A25-001681. Please contact me at your earliest convenience. Thank you!" J. Harrigan (continued in NOTE 2)

Memo   2/11/2025     Memo #:   M25-003808     2

(continued from NOTE 1) At 1739 hours I received a text message from K. Zvik which read, "Sure I am free now" followed by a phone call from her. K. Zvik verbally identified herself and claimed ownership of "Fortune CH" nicknamed "Cookie" a 9-year-old, gelding, brown horse. I identified myself and the reason for my contact. K. Zvik stated the following:

She was fully on board and willing to cooperate with the inhumane investigation. She understood "Cookie's" previous owner Marcy Roth was still invested in "Cookie's" wellbeing. K. Zvik contacted Kensington Police Department that morning due to M. Roth arriving at her home uninvited and harassing her. A Kensington Police Officer responded to K. Zvik's home that morning and took a statement.

I stated I appreciated K. Zvik's willingness to cooperate in Animal Services' investigation. I advised I needed specifics on "Cookie's" feeding schedule, veterinary care and K. Zvik's availability to meet with Animal Services at the pasture location to assess "Cookie's" condition. I advised I was currently transporting an injured animal to the emergency vet and could not jot down notes while driving but would call K. Zvik back in approximately 45 minutes.

K. Zvik requested I text message her the specific questions I had. K. Zvik advised she would respond via text message with all the information including recent photos of "Cookie", her veterinarian Mike O'Brien's contact information and veterinary records she had obtained from recent exams. K. Zvik stated she would be available in the afternoon on Thursday 02/13/25 and Friday 02/14/25, and all day on Saturday 02/15/25 and Sunday 02/16/25.

At 1755 hours I received the following response to my questions from K. Zvik via text message:

"1. The horse lives on pasture so forage is his main feed. The horse club feed 25% = 1 flake Sept thru Jan. I supplement with grain 1-2 times a week. My sponsor supplements him with grain 3 times a week.

## Contra Costa County Animal Services Department Activity Card

A25-001681-7    INV/INHUMANE2    Priority Level: 3    Total Animals: 1    Animal Type: DOG

Activity Address:  640 EL TOYONAL AVE  ORINDA , CA    94563

Actvity Comment:  Lt, Weissman or Sgt. Flauding to handle

2. Cookie feeds all day on forage on 745 acres. He is supplemented with grain M-W and S-S.
4. Primary vet is Mike Obrien. He was last seen to float his teeth Sep 6, 2024. He was also examined by a vet Oct 31, 2024, at a horse event where he completed an endurance ride.
6. Location is ███████, Orinda, CA."

I received additional messages from K. Zvik including a photo of "Cookie" she advised was taken on 01/ 11/24 and later clarified via phone call was taken on 01/11/25, as well as video of her interaction with Kensington Police Department Officer Jesse De Santiago and "Cookie's" previous owner M. Roth, additional information on care provided to "Cookie", and more details on her previous interactions with M. Roth.

At 1838 hours I made phone contact again with K. Zvik at ███████. I advised I had received her messages and would include all the information in my report. I advised Animal Services would follow up with her regarding setting a meeting with K. Zvik and "Cookie". K. Svik stated she would be willing to trailer "Cookie" to the Martinez Animal Shelter if it was preferable or meet at a more accessible location to then lead Animal Services to "Cookie's" pasture. K. Zvik advised the road leading to the pasture had collapsed and the area was a pain to drive to. I thanked K. Zvik for the information and advised I would forward my report to my superiors who would advise on how to move forward.

I later uploaded screen shots of my text message conversation and all of K. Zvik's attachments to the activity folder in SharePoint. I uploaded the photo K. Zvik sent me of "Cookie" to the animal screen in Chameleon. J. Harrigan

Memo    2/12/2025    Memo #:    M25-003824    3

02/12/25 at 1057 hours, I placed a call to Kim Zvik at ███████ to get a better idea on her availability tomorrow as it stated the afternoon. Upon calling, K. Zvik stated she would be available tomorrow 2/13/25 from 1530 hours on. And available all day Friday. She asked that whoever was responding let her know which side they were coming from (likely Orinda side) so she could provide instructions on how to access the location due to roads being closed out due to prior floods. She also mentioned she could bring the horse down in advance to where it was viewable from the road or if we wanted to see where it was being kept she could take the officer there and it would be approximately a 20 minute hike along with a release form needing to be signed as protocol. I advised I would note that information. I updated Lt. Weissman and Lt. Morales. Sgt. Ambeau

02/12/25 16:49 hours, I returned a call from Marcy Roth who had called in again regarding this activity. Roth advised she had just gotten in from her flight and was still very concerned regarding K. Zvik and the horse "Fortune." Roth stated Zvik is very litigious and has starved horses in the past allowing them to range in the same manner. Roth alleged Zvik has two horses, both of which have distended bellies, she believes from having worms and not receiving treatment. I advised Roth the Animal Services department had made arrangements with Zvik to have her show the horses to an officer within the next few days. Sgt. Flauding

02/13/25 FU TO CASE A5-001681 // 3 HORSES THAT ALL LOOK EQUALLY AS SICK // RP WANTS TO SEND IMAGES TO THE OFFICER - SHE IS NERVOUS THE OWNER WILL LEAD OFFICERS TO DIFFERENT HORSES THAT ARE MORE HEALTHY, SO SHE WANTS TO SEND IMAGES TO AN OFFICER SO THEY CAN CONFIRM CORRECT HORSES ARE BEING LOOKED AT // CONTACT ON SITE THAT IS WILLING TO HELP GUIDE THE OFFICERS FIND THE HORSE AS IT IS HARD TO LOCATE (CHERYL FULTON ███████). RP IS REQUESTING A CALL: MARCIE ROSS ███████

02/13/25 RP CALLING BACK FOR 31X21 ABOUT HER HORSE // ORGINAL OWNER OF HORSE CALLED THE OTHER DAY ABOUT THIS BUT SHE HAD TO GO BACK TO COLORADO // CASE #A5-001681 // ORGINAL OWNER CALLED ON 2/10 AND ON 2/11 LINE 8 AND 21. ARP CHERY FOULTON ███████ (SEE P0680567)

02/13/25 at 1541 hours, I attempted phone contact with Marcie Ross at ███████ and reached a voicemail box. I left a voicemail with my desk line, work hours and requested a call back.

At 1546 hours, I made phone contact with Cheryl Fulton at ███████. C. Fulton stated the following: She used to keep her horse at the Orinda Horseman's Association but moved it in January 2025. C. Fulton was familiar with K. Zvik and "Cookie" and was also concerned with "Cookie's" weight loss. I advised C. Fulton we would be responding to the location to view "Cookie" and assess his condition. C. Fulton advised there are two other horses that look very similar to

**Contra Costa County Animal Services Department Activity Card**

A25-001681-7    INV/INHUMANE2    Priority Level: 3    Total Animals: 1    Animal Type: DOG

Activity Address:  640 EL TOYONAL AVE  ORINDA , CA    94563

Actvity Comment:  Lt. Weissman or Sgt. Flauding to handle

"Cookie," another bay Arabian who did not have a white crescent on his forehead and another bay horse with a similar marking to "Cookie" but was not an Arabian and had a different head shape than "Cookie ." I advised C. Fulton I would likely be the one responding and would call her if assistance was needed. Lt. Weissman

02/14/25 13:57 Kusia from Orinda Horseman's association called in to advise that they were advsied of a complaint made at their property. She advised she would like to be called before hand because a form of liability needs to be signed for whenever people enter their property. She advised she is on the board and would like to be called if someone is arriving. She advised she is out of town for the weekend so the next person to call us the president Alise Torres ████████ . I advised LT. Reed and he advised Lt. Weissman was en route and that he called Kusia. LCifu

Memo   2/15/2025         Memo #:   M25-004153      4

02/14/25 at approximately 1400 hours, Sergeant Flauding, Administrative Services Assistant II M. Todoroff and I responded to the Orinda Horseman's Association located at ████████ in Orinda. Upon arrival we made contact with Kim Zvik and Kusia Hreshchyshyn who verbally identified themselves. K. Hreshchyshyn advised she was on the Board of Directors for the Orinda Horseman's Association. K. Zvik claimed ownership of "Cookie" a 9 year old, bay, Arabian gelding and "Comet" a 7 year old, bay, Arabian gelding.

K. Zvik stated the following: She bought "Cookie" in August 2024. K. Zvik has kept "Cookie" at the Orinda Horseman's Association since she purchased him where he lives in a pasture with approximately 30 other horses. From February – August the horses only eat the grass that grows in the pasture. From September – February the horses are provided approximately 3 bales of a grass/alfalfa hay a day in addition to the grass in the pasture. Dr. Michael O'Brien had last examined "Cookie" in September 2024 and per the veterinary records found "Cookie" to be a 4+/9 on the Henneke Equine Body Condition Scale. K. Zvik competed in a 50 mile endurance race with "Cookie" in October 2024 where the race veterinarian did not have any concerns with his weight. After the endurance ride K. Zvik noticed "Cookie" began to lose weight. K. Zvik had not been allowed to utilize the few stalls at the Orinda Horseman's Association to separate "Cookie" during feed time and give additional feedings until this last week. "Cookie" is currently allowed to stay in a stall for a week where he is receiving 4 flakes of a grass/alfalfa hay and 10 pounds of LMF Showtime grain daily. K. Zvik scheduled an examination with Dr. Obrien for 2/27/25 as well.

I performed a Henneke Equine Body Condition Score on "Cookie" explaining what I was doing and my findings as I did it. I found "Cookie" to score a 2.8/9, showing him to be thin to very thin, which K. Zvik agreed with.

I advised K. Zvik of her responsibilities and Penal Code 597. I advised "Cookie" would need to be examined and treated by a vet and be put on a weight gain plan, which she stated she understood. I advised not all horses are adept to living in a pasture with other horses and if "Cookie" did not improve she may need to move him to another facility, which she stated she understood. I advised K. Zvik it was not the responsibility of the Horseman's Association to provide accommodations for "Cookie," it was her responsibility to ensure he received proper care.  I advised K. Zvik we will follow up with her after her appointment with Dr. Obrien. I completed a Henneke Equine Body Condition Scoring Sheet and Sergeant Flauding took photographs and video of "Cookie." Lt. Weissman

02/16/25 FOLLOWING UP ON A WELLNESS CHECK FOR A HORSE // SAYS OTHER HORSE AT THE ADDRESS MIGHT BE NEGLECTED AS WELL RP Marcy Roth ████████

02/17/25  RETURN CALL FROM INC #21 ON 2/16 - RP WOULD LIKE FOLLOW UP ON WELCK OF HORSES  Marcy Roth ████████

02/18/25 UPDATED CALL FROM 2/10 SEE LINE #7 // RP IS WORRIED SICK ABOUT A HORSE SHE SOLD TO THIS LOCATION// ALANA WEISSMAN WAS SUPPOSED TO CALL AND DO A WELLNESS CHECK ON THE HORSE BUT RP HASNT HEAR ANYTHING// RP IS FRUSTRATED AND WANTS A CALL BACK AND UPDATE ON HORSE// WHEN SHE CALLED LAST WEEK SHE WAS TOLD THE WELLNESS CHECK WOULD BE DONE IN 1-3 DAYS AND STILL HASN'T BEEN CONTACTED// THIS LOCATION HAS BEEN STARVING MANY HORSES PER RP, NOT JUST THE ONE SHE SOLD// Marcy Roth ████████

02/19/25 at 0909 hours, I attempted phone contact with Marcy Roth at ████████ and reached a voicemail box. I left a voicemail with my desk line, work hours and requested a call back.

**Contra Costa County Animal Services Department Activity Card**

A25-001681-7        INV/INHUMANE2        Priority Level: 3        Total Animals: 1        Animal Type: DOG

Activity Address:  640 EL TOYONAL AVE  ORINDA , CA      94563

Actvity Comment:   Lt. Weissman or Sgt. Flauding to handle

At 0922 hours, I received a voicemail from M. Roth requesting a call back.

At 1036 hours, I made phone contact with M. Roth at [redacted]. I advised M. Roth of our findings and advised we would continue to follow up to ensure "Cookie" received veterinary care and gained weight. Lt. Weissman

02/20/25 at 0841 hours, I was forwarded an email sent to the department by Kara Shoop on 2/20/25 at 0825 hours. K. Shoop requested we continue to monitor "Cookie." I responded to K. Shoop advising the activity was still open. K. Shoop had not seen "Cookie" in person recently and had not further information. Lt. Weissman

02/25/25 upon the beginning of my shift I received an email which had been forwarded to me by clerical staff . The original email was sent by Rachel Katz on 2/21/25 at 1810 hours advising of concern regarding "Cookie." I responded to R. Katz to advise the activity was still open for follow up. R. Katz had not personally seen "Cookie" and did not have further information. Lt. Weissman

02/26/25 14:53 Anonymous RP called regarding this activity. Call details from dispatch:

*ANOTHER COMPLAINT FROM A NEW RP ON THIS ADDRESS* HORSES ARE NOT BEING FED // ONE HORSE OWNER IS KIM ZVICK // RP HAS TALKED TO THE OWNER KIM AND SHE ADMITTED TO BARLEY FEEDING THE HORSE DURING THE WINTER AND THEY FEND FOR THEMSELVES DURING THE OTHER MONTHS // RACES THE HORSES AS WELL // JUST BY LOOKING AT THEM YOU CAN TELL THEY ARE STARVED // SHOULD BE ABLE TO SEE HORSES FROM THE ROAD

Investigation is still onging, no new call created. Sgt. Flauding

02/27/25 at 0911 hours, I received an email from M. Roth in which she forwarded me an email written by a Linda referencing a historical concern about multiple horses losing weight over winter at the Orinda Horse Association . I advised M. Roth I would follow up on the information.

I attempted phone contact with the Orinda Horse Association president Kusia Hreshchyshyn at [redacted] and reached a voicemail box. I left a voicemail with my desk line and requested a call back. Lt. Weissman

02/28/25 at 1046 hours, I received an email from K. Zvik which included a photograph of Dr. Cory Soltau's examination notes for "Cookie" on 02/25/25. The notes indicated "Cookie" had a body condition score of 3.5/9, no significant findings and no recommendations. Dr. Soltau advised they believed "Cookie" would gain weight naturally with new grass growth and winter passing.

At 1100 hours, I received a call from K. Zvik advising she had sent the records and wanting to confirm the activity had been closed. I advised K. Zvik I had received the records, however our department had not closed the case and we would be following up at the beginning of April to view "Cookie" and ensure he had gained weight. Lt. Weissman

2/23/2025

Memo    2/28/2025        Memo #:   M25-005756        5

02/28/25 at 1300 hours I received a text message from Kim Zvik at [redacted] with a photograph of equine veterinarian Cory H. Soltau's written notes regarding a visit on 02/25/25 to evaluate "Cookie's" physical condition. DVM C. Soltau noted the following:

1. Body score - 3.5
2. Heart rate 40 beats per minute
3. Good gut sounds
4. Movement- Trots willingly and with good attitude
5. Sound at trot
6. Dental check – good dental contiontion

## Contra Costa County Animal Services Department Activity Card

A25-001681-7      INV/INHUMANE2      Priority Level: 3      Total Animals: 1      Animal Type: DOG

Activity Address:  640 EL TOYONAL AVE  ORINDA , CA      94563

Actvity Comment:  Lt. Weissman or Sgt. Flauding to handle

7.    Worming history up to date
8.    "I consider "Fortune's" condition acceptable for winter, pasture environment and am confident with increased grass growth and consistent supplementation he will improve in Body Score."
9.    Suggest consistent training and exercise

I uploaded the photo to the activity folder in SharePoint.

K. Zvik asked me via text message to confirm the case was closed and send her the file. I responded to K. Zvik at 1405 hours via text message that I received her message, added the recent veterinary exam notes to the report and that the case was still ongoing. I reminded K. Zvik she could request records by speaking to an Animal Services clerk. I provided Animal Services phone number and the activity number to reference. J. Harrigan

EXHIBIT "C"



8:22 PM

Arabian Horses-
Anything and Everything |
Facebook
facebook.com

I made a mistake. Six
months ago, I sold my
beautiful, spunky
Arabian, Fortune CH
(Cookie) to Kim Zvik,
in Northern California.
He would be on
hundreds of acres of
pasture with 35

horses including her
other endurance
horse, Comet.

But, over the months,
I've watched him
deteriorate from a
perfectly conditioned
and happy horse to a
skeleton.

He was raced in four
50-mile AERC
endurance rides with
no nutrients, only the
dry grass of summer
and fall, which is just
now growing in.

Despite knowing full
well I had been
feeding him 22
pounds of alfalfa and
six pounds of Ultium

Why does no one call
them out - their
friends, fellow racers,
other members of
their barns,
community,
associations, the
AERC vets?

AERC (American
Endurance Ride
Conference) members
have said to me:
"Remember those two
at Spanish Peaks, so
skinny and still
allowed to race?" And,
"AERC definitely needs
to enforce stricter

well-conditioned and
cared for horse should
look.

We all must take action
to prevent animal
abuse and neglect!

Email the AERC to tell
them to look out for
these horses, to
enforce stricter
standards for body
condition, saddle fit
and care.
ExecutiveDirector@AE
RC.org
Dr. Melissa Ribley
mmribley@gmail.com
Email Orinda

standards on body
conditions and
saddle-fit. But, no one
wants to rock the boat
with the vets at a
race."

Horseman Association (OHA), and tell them to feed starving horses themselves if they have to. Don't stand by and watch two MORE horses die at your facility. board@orindahorsemen.org

Email the Range Manager for East Bay Municipal Utility District and ask him to terminate the lease to OHA because they are not capable of managing the care of horses there on OUR PUBLIC LAND. Alberto Mendo, Range Supervisor East Bay Municipal Utility

Municipal Utility District amendo@ebmud.com

Email Contra Costa Director of Animal Services Beth Ward and Lieutenant Alana Weissman at and ask them to diligently monitor the care of Cookie and Comet. asdweb@asd.cccountyus

Message Kim Zvik here on Facebook and demand she re-home her horses if she can't feed them. Or Kimzvik@gmail.com

YOU MAY WANT TO

















**Kim Peterson**
Can't a humane inspector seize him. What state is he in?

1w

**Marcy Roth**
Kim Peterson California. It's very challenging to get an animal removed, but you can bet I'm working on it. I wonder if it would help to have more people contact the Contra Costa Animal Services Investigators at 925-608-8400 and call for the removal of her horses.

1w

**Marcy Roth**
There are two organizations you could write to that might help save Cookie and other horses in jeopardy:
AERC American Endurance Ride Conference
EBMUD, the agency that manages the public land on which multiple horses have been allowed to starve.
Below are emails and sample letters -- Please make the words your own and send ASAP:
AERC Email:
mmribley@gmail.com
executivedirector@aerc.org
Ms. Ribley, the ED of AERC, and the entire Board,
Kim and Tal Zvik must be banned from AERC. The horse Fortune CH (Cookie) must not be allowed to race. I am appalled by the condition of horses owned by Kim Zvik. I personally know Cookie and his current condition is disgusting, having been allowed to race in 50 mile AERC rides with no nutrients. He was a beautiful specimen of a horse when I knew him and now he is at risk of organ failure from starvation.
AERC must enforce more rigorous standards in their vetting:

## Marcy's Post

executivedirector@aerc.org

Ms. Rib[illegible], the ED of AERC, and the entire Board,

Kim and Tal Zvik must be banned from AERC. The horse Fortune CH (Cookie) must not be allow[illegible] to race. I am appalled by the condition of horses owned by Kim Zvik. I personally know Co[illegible]kie and his current condition is disgusting, having been allowed to race in 50 mile AERC rides with no nutrients. He was a beautiful specimen of a horse when I knew him and now he is at risk of organ failure from starvation.

AERC must enforce mo[illegible]e rigorous standards in their vetting:

1) A minimum Body Cor[illegible]dition score must be enforced and horses who do not meet the minimum should not be allowed to race.
2) Saddle fit must be chec[illegible]ed so sores like those shown below do not result.
3) Horses who are underfe[illegible]/underweight should not be allowed to race, regardless of their hard-keeper excuses, etc.

NEXT:
EBMUD Range Manager Albe[illegible]o Mendo could cancel the lease with Orinda Horseman's Association who is allowing th[illegible] starvation, neglect and abuse of Cookie and Kim's other horse Comet, and has allowed t[illegible]is in the past, according to other past members.

Please email:
amendo@ebmud.com

Dear Mr. Mendo,

It has come to my attention that the[illegible]e are starving horses located on EBMUD property run by the Orinda Horseman's Associ[illegible]tion. I knew one of those horses when he lived in Colorado just six months ago. His curr[illegible]nt state is appalling, sad and unacceptable, particularly on taxpayer land.

Please end the lease so the horses can b[illegible] transferred to somewhere they will be cared

EXHIBIT "D"

# Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, *United States Code*, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Shira Perlmutter*

United States Register of Copyrights and Director

**Registration Number**

## VA 2-441-905

**Effective Date of Registration:**
February 22, 2025

**Registration Decision Date:**
April 16, 2025

## Copyright Registration for a Group of Published Photographs
Registration issued pursuant to 37 C.F.R. § 202.4(i)

For Photographs Published:   August 03, 2024 to August 03, 2024

### Title ───────────────────────────────

|  |  |
|---|---|
| **Title of Group:** | Cookie2024 |
| **Number of Photographs in Group:** | 1 |

### Completion/Publication ───────────────

|  |  |
|---|---|
| **Year of Completion:** | 2024 |
| **Earliest Publication Date in Group:** | August 03, 2024 |
| **Latest Publication Date in Group:** | August 03, 2024 |
| **Nation of First Publication:** | United States |

### Author ──────────────────────────────

|  |  |
|---|---|
| **Author:** | Kim Zvik |
| **Pseudonym:** | Kim Zvik |
| **Author Created:** | photographs |
| **Citizen of:** | United States |
| **Domiciled in:** | United States |
| **Year Born:** | 1964 |

### Copyright Claimant ──────────────────

|  |  |
|---|---|
| **Copyright Claimant:** | Kim Zvik |
|  | 263 Kenyon Avenue, 263 Kenyon Avenue, Kensington, CA, 94708, United States |

### Rights and Permissions ──────────────

|  |  |
|---|---|
| **Name:** | Kim Zvik |

Page 1 of 2

|              |                                          |
|-------------:|:-----------------------------------------|
| **Email:**     | kimzvik@gmail.com                        |
| **Telephone:** | (510)421-3140                            |
| **Address:**   | 263 Kenyon Avenue                        |
|              | 263 Kenyon Avenue                        |
|              | Kensington, CA 94708 United States       |

## Certification

|          |                    |
|---------:|:-------------------|
| **Name:** | Kim Zvik           |
| **Date:** | February 22, 2025  |

**Copyright Office notes:**      Regarding title information: Deposit contains complete list of titles that correspond to the individual photographs included in this group.

Regarding group registration: A group of published photographs may be registered on one application with one filing fee only under limited circumstances. ALL of the following are required: 1. All photographs (a) were created by the same author AND (b) are owned by the same copyright claimant AND (c) were published in the same calendar year AND 2. The group contains 750 photographs or less AND 3. A sequentially numbered list of photographs containing the title, file name and month of publication for each photograph included in the group must be uploaded along with other required application materials. The list must be submitted in an approved document format such as . XLS or .PDF. The file name for the numbered list must contain the title of the group and the Case Number assigned to the application.

4/22/25, 10:01 AM                    FW: Copy Right Cookie Photo with my Son - Nathaniel A. Stevens - Outlook



about:blank
1/1

EXHIBIT "E"

 Gmail

**Kim Zvik <kimzvikoha@gmail.com>**

---

## Updates: Kim lost in court yesterday AND the Animal Control case continues

**OHA Board** <board@orindahorsemen.org>
To: Marcy Roth <marcy_roth@yahoo.com>
Cc: board@orindahorsemen.org, OHA business <business@orindahorsemen.org>

Wed, Mar 5, 2025 at 12:35 PM

Marcy,

As we've already shared, OHA is absolutely committed to the health and well-being of our horses and the stewardship of the EBMUD pastureland where they live. For several decades, OHA has maintained a healthy and happy herd while providing critical fire fuels management and enhancing and restoring native vegetation on critical watershed lands through rotational grazing. In response to your concerns regarding Kim Zvik's horse Cookie, here is what the OHA Board has done and continues to do:

1. We have taken decisive disciplinary measures in accordance with our rules and bylaws, by which we are legally bound.
2. We directed Kim to provide the board with daily feeding logs.
3. We encouraged our members to help Kim with additional feeding support for Cookie.
4. We directed Kim to provide us with a detailed veterinary report. This report indicated that Cookie's condition is improving some, though we agree it has not improved enough yet. Therefore, we requested that Kim provide another veterinary report at the end of March.
5. We have been in regular contact with Contra Costa County Animal Control and will cooperate if they recommend changes to our facilities or practices.
6. We have been in regular contact with EBMUD to provide factual information related to your allegations and to offer them a tour of the OHA herd and pastures at any time.

It has been less than a month since you contacted us. We have reached out offering to provide you with factual information about OHA and we have been working diligently on this situation, yet you continue to attack OHA and post misleading information on social media. Please stop attempting to destroy OHA. You are threatening the health and well-being of our herd and causing immense stress to our dedicated, horse-loving members. Our horses are in good condition and very happy. We can arrange a video tour of the herd if you'd like to see them.

Regarding your statement, "Let these horses go to other facilities that have the capacity to manage their herd in a humane and ethical manner." Respectfully, all 30+ horses at OHA are privately owned by our members. Our members choose to stay because their horses thrive here. There can be no better confirmation that OHA's horse management practices are well suited to maintaining the health and happiness of our equine partners.

In addition, there are no other facilities in the area that offer a herd setting or even pasture space that can accommodate 30+ horses. Your misleading calls to end our lease threatens to leave our horses homeless and to break up horses that are very bonded to each other and used to living on the pasture. We know you do not intend to inflict harm on 30+ horses because of your concerns about Cookie's health. Please stop attacking OHA and instead work with us in positive ways to address your concerns about Cookie's condition.

Best Regards,

OHA Board

*Elise Torres, President; Linnea Wren, Vice-President; Mark Tompkins, Secretary; Sylvie Thome, Treasurer; Kusia Hreshchynshyn, Communications*

**From:** Kim Zvik <kimzvikoha@gmail.com>
**Sent:** Monday, March 10, 2025 8:49 AM
**To:** Matthew Davine <Matthew@cataneselaw.com>
**Subject:** Fwd: Updates: Kim lost in court yesterday AND the Animal Control case continues

---------- Forwarded message ---------
From: **OHA Board** <board@orindahorsemen.org>
Date: Mon, Mar 10, 2025, 8:23 AM
Subject: Re: Updates: Kim lost in court yesterday AND the Animal Control case continues
To: Marcy Roth <marcy_roth@yahoo.com>
Cc: OHA business <business@orindahorsemen.org>, Alana Weissman
<alana.weissman@asd.cccounty.us>, Alberto Mendo <alberto.mendo@ebmud.com>

Marcy,

OHA is obligated to abide by our lease and to comply with the law. As such, we answer to EBMUD and Animal Control, and will make any information requested by them available to them.

As we informed you in our email of February 25, 2025, your public statements on Facebook that Orinda Horse Association starves horses and has allowed horses to die by starvation are false, and defamatory. Moreover, your false statements dishonor the memory of an incredibly well-loved and well-cared for horse who died in his old age. We require you to revise your post's text, photos, and video to remove all statements and slides and any other content falsely alleging starvation at Orinda Horse Association.

OHA feeds 5-6 months a year depending on grass and herd condition.  We test the grasses to get information about nutrient density and feed accordingly. Over the years, OHA has bought more hay and changed the schedule to start feeding earlier in the season based on forage conditions in order to ensure optimal herd health. Our feeding plan is not dependent on funding, OHA has increased dues when needed, and we do not determine feeding on a least-cost basis. We have a committee that regularly checks the condition of the grasses and manages our rotational grazing plan accordingly. Most horses in our herd maintain a healthy weight year round, and this has been the case for decades, with hundreds of horses. OHA makes clear to members and prospective members that the pasture isn't a good fit for all horses, and it is up to individual owners to monitor the condition of their horse and supplement as necessary for their horse's individual requirements, or move to another facility if the pasture isn't working

1

for their horse's health (see Information & Application: Additional Membership Criteria). Over the years, horses in the herd have moved to other facilities if they weren't thriving on the pasture (generally really old horses and a couple with injuries that made the hilly terrain unsuitable).

Regarding Cookie, Kim is cooperating with Contra Costa Animal Services and OHA is supporting her in providing additional hay and grain. Horses do not typically regain weight rapidly. Contra Costa Animal Services indicated they will return in several weeks to determine if Cookie's rate of weight gain is sufficient. If Contra Costa Animal Services's assessment or the veterinary assessment is that pasture life isn't appropriate for Cookie, he will leave OHA. Regarding the herd overall, members are required to vaccinate, worm, and provide hoof, dental, and medical care in accordance with current best practices. Further, we plan to improve our existing guidelines on horse condition score, to further explicate OHA's requirement that members ensure the good health of their horses. Going forward, if operational changes are recommended by qualified horse husbandry professionals such as Contra Costa Animal Services, equine professionals, and veterinary doctors OHA will happily make those changes.

We welcome the public to learn more about OHA and our horses. We are willing to give anyone with concerns a tour of the herd (including in the summer or fall when the grasses turn brown). While the herd does live on protected watershed land and EBMUD has posted "No Trespassing Signs" to protect the watershed, OHA's operations are visible, open and welcoming. Depending on which pasture the herd is in, the horses are sometimes visible from the pedestrian only public road that runs through the property, which is a popular walking trail, and sometimes from a major road in Orinda. Further, our main horse care areas are right along the public road that runs through the property and members of the public regularly stop to chat with us and pet the horses. We regularly have visitors to the facility, host community events, and have had Girl Scout troops out several times as well as local school youth groups.

While it may be the case that your concern for Cookie's health is sincere, your false allegations are unconscionable, and your suggestions for herd management changes indicate a misunderstanding of the high standards already in place at OHA.

Best Regards,
OHA Board

*Elise Torres, President; Linnea Wren, Vice-President; Mark Tompkins, Secretary; Sylvie Thome, Treasurer; Kusia Hreshchyshyn, Communications*

EXHIBIT "F"

*Catanese & Wells*
*A Law Corporation*
*4580 East Thousand Oaks Boulevard*
*Suite 250*
*Westlake Village, California 91362*
*Telephone (818) 707-0407*
*Facsimile (818) 707-1161*
*www.cataneselaw.com*

March 20, 2025

**VIA U.S. POSTAL SERVICE**

**AND EMAIL**

Ms. Marcy Roth
10394 Macedonia St.
Longmont, CO 80503
Marcy_roth@yahoo.com

        Re: *Cease and Desist Demand re: Kim Zvik*

Dear Ms. Roth:

        Our office has been retained as legal council for Ms. Kim Zvik. We send this letter to you on her behalf in connection with various facts and circumstances which are set forth below. Furthermore, our client demands that you cease and desist from any actions on your part which are defamatory or cause interference with our client's existing personal and business relationships.

*Factual Background*

        We understand that you did formerly reside in Marin County in California. Further, we also understand that you did operate a winery in California, which you later sold. After you sold the winery you moved to Colorado. Accordingly, we believe that you have minimum contacts with the state of California by reason of your prior residence and business in California and by reason of those actions described hereinbelow.

        Our client has provided to our office a document with the title "Purchase Agreement." A review of the document indicates that it purports to be a sale contract or Bill of Sale for the horse identified as *Fortune CH.* It appears that you were the seller of the "Horse" and our client was the buyer of the Horse. The document also recites that the purchase price of the Horse was $14,000.00 to be paid in cash by our client to you on or before July 12, 2024. Our client informs us that she did pay you the full purchase price for the Horse as required under the Purchase Agreement. Once the purchase price was paid, our client became the sole and exclusive owner of the Horse free of any claims or rights by you to the Horse. Specifically, the Purchase Agreement did not give you any post-sale rights to the Horse which includes

no right of inspection of the Horse or for information about the Horse.

Further to the above, our client has never given you the right to inspect or examine the Horse wherever situated once our client paid the purchase price for the Horse to you.

Notwithstanding the above, you demanded that our client allow you to monitor, inspect and examine the Horse after the sale was completed. Our client refused this request by you. We are informed that following this refusal by our client, you engaged in intentional acts of defamation on social media and with business internet services. In addition, we also have seen evidence of your interference and defamation damaging our client's reputation and causing disruption of our client's contractual interests with third parties. This includes our client's relationships with OHA Board which provides care for the Horse and with the American Endurance Ride Conference. We are also informed that you have created disruption of other valued relationships that our client enjoys and relationships which have taken many years to develop.

*We are further informed that you have maliciously published to third parties false statements about our client. These false statements include, but are not limited to, claims by you that our client has not properly cared for the Horse and that our client is guilty of animal cruelty. These claims impugn our client by identifying her as committing acts and omissions which may give rise to criminal action. Of course, none of these statements by you are true.*

Proof of the falsity of your defamatory published statements regarding our client is the written veterinary report of Cory H. Soltau, D.V.M. dated February 25, 2025. In Dr. Cory's written report he stated that the Horse had an acceptable condition for winter pasture. Since the date of the report our client has worked diligently to ensure the health and safety of the Horse. Obviously, our client as the owner of the Horse has an interest in protecting the health of the Horse.

Moreover, our office has reviewed records from the Contra Costa County Animal Services Department wherein they note all of the communication between you and their office involving our client, the Horse and OHA Board. These records further confirm your defamation against our client. Additionally, the notes indict that Dr. Soltau found the Horse to have a body condition score 3.5/9. Further, the notes indicted that Dr. Soltau believed the Horse would gain weight naturally as spring approached and new grass appeared in the pasture.

### Demand to Cease and Desist from Further Defamation and Interference with Contractual Relations

Under California law damages are presumed where this type of defamation occurs. *See California Civil Code Sections* 45 and 46. Of course, our client is also entitled to actual damages and punitive damages against you by reason of your actions as detailed above.

Demand is made that you immediately cease and desist from any further defamatory communication with any person or entity in relationship with our client or from publishing any false statements about our client on social media.

Further to the above, our client demands payment for her monetary damages by reason of your

actions.

Your reply to this letter is required on or before March 25, 2025 if you wish to avoid a lawsuit by our client for her damages caused by your tortious conduct.

Sincerely,

CATANESE & WELLS
A Law Corporation

T. Randolph Catanese